# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE

Assigned on Briefs November 9, 2011

## STATE OF TENNESSEE v. JOSE GARCIA (a/k/a HILBERTO ALEJANDRO RENTIRA LERMA)

**Direct Appeal from the Circuit Court for Montgomery County**
No. 40800308     Michael R. Jones, Judge

No. M2010-01661-CCA-R3-CD - Filed March 13, 2012

A Montgomery County jury convicted the Defendant, Jose Garcia, of conspiracy to commit aggravated robbery, four counts of aggravated robbery, and especially aggravated kidnapping, and the trial court sentenced him to an effective sentence of sixteen years, to be served at 100%. On appeal, the Defendant contends that: (1) the evidence is insufficient to support his convictions; and (2) the trial court erred when it made several evidentiary rulings. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Jordan D. Mathies, Nashville, Tennessee, for the appellant, Jose Garcia.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; John W. Carney, Jr., District Attorney General; Helen O. Young, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from the robbery of an F&M Bank in which three men participated. After the robbery, the men took a bank teller, who later escaped, with them when they left the bank. For his alleged participation in this robbery, a Montgomery

County grand jury indicted the Defendant for one count of conspiracy to commit aggravated robbery, four counts of aggravated robbery, and one count of especially aggravated kidnapping. At his trial, the parties presented the following evidence:

Sheila Woodard testified that she was working at an F&M Bank in Clarksville, Tennessee, on January 15, 2008, as the "head teller" or "vault teller." Working with her that day were Nancy Dueker, Gladys Gutierrez, and Tracy Anderson. Around noon, there was one customer in the bank, Georgie Stenson, at Gutierrez's window, and one customer, Tara Stanton, in her car parked in the drive-thru lane of the bank. Two Hispanic men walked in, one of whom she identified as the Defendant. She described the Defendant as "heavier set" and as wearing sunglasses, a John Deere cap, and a plaid jacket. She described the other man as "smaller built" and as wearing a cap, glasses, and a grey hoodie. She also testified that this man wore a false mustache that kept sliding on his upper lip.

Woodard said she acknowledged the men and asked them if they needed some help. The man in the grey hoodie told her that he needed to open an account, so she informed him that the woman in charge of opening accounts was with a customer, to have a seat, and she would be with him shortly. Both men proceeded to the couch on the other side of the customer desk and had a seat and waited. Woodard testified that she had a bad feeling based on the disguises, so she called the head of operations of the bank to inform her that she suspected the bank was going to be robbed. While she was on the phone, Gutierrez told her to hang up the phone because the bank was being robbed. Woodard testified that the next thing she knew, the man with the grey hoodie was behind the teller row brandishing a gun.

Woodard identified several pictures taken during the robbery by the bank's security system, which took pictures intermittently from more than five cameras. During her identification of these photographs, Woodard described the Defendant's demeanor, saying:

> [H]e acted like he was in charge; very calm acting, very watching, hands stayed in his pocket, and occasionally if things weren't moving quick enough or happening the way he wanted he'd bring a hand out and shout out instructions.

Woodard said that, when the Defendant offered instructions, he used "short, direct commands" in English. She described the man in the grey hoodie as "not so much the dominate one, more or less the one doing what he's supposed to be doing."

--

2

Woodard testified that the tellers placed all of the money in a cloth currency bag, while the man in the grey hoodie and the Defendant told them to "hurry up." In the money bag, the tellers also placed "dye packs." After the money was placed in the bag, the robbers asked for keys to a car. Another teller, Tracy Anderson, gave them her car keys, and the men instructed Anderson to accompany them to the vehicle. The Defendant stayed two to three steps in front of Anderson, who appeared scared, as they left the bank. Woodard said she could see Anderson outside through the windows of the bank's drive-thru, and she was concerned for her safety. In one of the drive-thru bays, Woodard saw a customer, Tara Stanton, who was driving a white truck. Also through these windows, Woodard saw Anderson run away, and so she went to the front on the bank and unlocked the doors for Anderson to return inside the bank. Woodard testified that, after Anderson had run away from the robbers, Stanton pulled her truck behind Anderson's vehicle, preventing the car from exiting the bank parking lot.

On cross-examination, Woodard testified her duties as "head teller" included ensuring that the date and time of the security system was accurate. She said that she also examined the security cameras once a month to ensure they were working properly. If there was an issue with any of the cameras, such as a lens being out of focus, she would call the surveillance camera company, and the company would send a representative to service the camera. She said she had checked all the cameras in the bank at some point before, but near, January 5, 2008, which was ten days before the robbery.

Woodard said the man in the grey hoodie never discharged the gun while inside the bank, and she estimated it was two to three minutes between when the men sat down on the customer service sofa and when they began the robbery. Woodard testified that the Defendant wore sunglasses for the duration of the robbery, but he scanned the room and looked in the direction of each of the employees.

Nancy Dueker, an employee with F&M Bank, testified she was working at the bank on January 15, 2008, at around noon, when the robbery occurred. She explained that she was waiting on a regular customer, Tara Stanton, at the drive-thru when she heard another employee, Sheila Woodard, say that she thought the bank was being robbed. When she looked around, she saw that two suspicious looking men had entered the bank together, one wearing a "fake mustache" and sunglasses and the other wearing sunglasses and a "cap." Dueker identified a picture of Roberto Gomez Vasquez as being the man wearing the mustache and sunglasses and carrying the gun. She identified the Defendant as the man who entered the bank with Vasquez. Dueker testified that she also identified the Defendant on the day of the robbery when police brought him to the bank after his apprehension.

--

3

Dueker testified that one of the men came behind the teller line with a gun, and he told the bank employees that they wanted "all [the] money." Dueker "pulled the dye pack," so it would be ready to place into the bag with the money. The Defendant then went to the teller's "gate" and said open the door "we want all your money." The tellers put the money in a white, cloth bag. One of the men said that he wanted some car keys, and Anderson gave him her car keys. The two men then went through the gate and left, taking Anderson with them.

Dueker testified that she wanted to communicate with her customer, Stanton, that there was a robbery in progress, but she was unable to do so because the robbers had ordered her to look away from the window. Dueker testified that, after the robbers left, she saw that Stanton was still at the bank. She did not see, however, the events that occurred thereafter.

On cross-examination, Dueker testified that when police officers brought the Defendant back to the bank for her to identify him, the other robber, Vasquez, was not with him. At the time police officers had the Defendant outside the bank, all of the tellers were inside the bank building. She said she looked at him through the glass doors. Dueker said that Anderson did not look like she was leaving with the Defendant and Vasquez willingly, but she did not see the Defendant touch, or hear him threaten, Anderson. She confirmed that the Defendant was not the man with the gun.

Tracy Anderson, a F&M Bank employee, testified that she was working on January 15, 2008, when, shortly after noon, she returned from her lunch break. Upon her return, she noticed one woman and two men in the bank. The woman she recognized as a regular customer, Georgie Stenson, and the two men, who were both standing in the lobby, she did not recognize. Anderson said she reopened her teller line immediately upon returning to the bank.

Anderson testified she heard the two men talking to one of the tellers, Sheila Woodard, who told them to step over to the new accounts desk. One of the men, whom she identified as Vasquez, then approached Anderson's desk and told her that he was robbing the bank. She described Vasquez as wearing a grey hoodie and a false mustache, which was falling off. She said the other man, the Defendant, was wearing a plaid jacket, a green, John Deere hat, and sunglasses.

Anderson said that Vasquez instructed her to put the money in the bag while the Defendant approached the teller door, telling the tellers to open a door between the tellers and the lobby of the bank. The tellers complied and opened the door, and Vasquez came through the door and repeatedly told the tellers to "hurry up" putting the money in the

--

4

bags. Anderson said that, normally, the tellers kept approximately $8500 in their drawers, and they gave him all the money they had in their drawers. Anderson explained that they complied with Vasquez's request because he insisted they do so while he held the gun. Anderson described the Defendant's demeanor during the robbery as "more in control [and] calm mannered" while she found Vasquez "[r]eally nervous, on edge." Anderson said the Defendant seemed to know what he was doing.

After Anderson and the other tellers gave the robbers the money, Vasquez asked for keys to a car. Anderson said she was able to privately discuss the matter with another teller, Gutierrez, and the two decided Anderson should give the robbers her keys because she had GPS in her car. The two thought that the police might be able to track the robbers using the GPS unit. When Anderson handed Vasquez the keys, Vasquez ordered her to leave with them. Anderson complied, noting that Vasquez still had his gun at the time. As they were leaving, Anderson saw that the Defendant was carrying the bag containing the money from the bank.

Anderson testified that, once she got outside with the two robbers, they walked underneath the drive-thru. At this point the dye packs "started going off," and the robbers told her that there was no money in the bags. Anderson told them that there was, in fact, money in the bags, but the robbers handed her the bag. Anderson explained that the dye packs make a "pop[]" when they go off and contain a substance that burns ones eye's, similar to tear gas. Anderson said that they continued on to her truck, and, when they arrived, she unlocked the truck, handed the key to Vasquez, dropped the money, and turned and ran away.

Anderson said she later viewed pictures of the incident, which were taken by the bank's security system. From those photographs, she saw that bank customer Stanton's truck was still parked in the drive-thru when Anderson went to her car with the robbers. She said, however, that she had no independent recollection of the car being there at the time. Anderson first became aware of Stanton's vehicle when she turned around while running, after she heard a "loud bang." The bang was caused by a collision between her truck and Stanton's truck.

On cross-examination, Anderson testified that, when Vasquez informed the tellers that he was robbing the bank, and the Defendant was standing next to a wooden door leading to the back of the bank, she could only see the Defendant from the chest up. She said the Defendant wore sunglasses and a John Deere hat the entire time he was at the bank. He never spoke directly to her, but he addressed the entire group when he told them to open the door. Anderson said the Defendant never asked for keys to a car. She said she did not recall where the Defendant was in relation to herself when they walked

--

5

outside or when she ran away from the robbers.

Anderson testified that she was present at the bank when police officers brought the Defendant back to the bank for identification. She said he was dressed in the same manner as when he robbed the bank. She said she identified him when officers had her look outside the glass doors of the bank at the Defendant. Anderson agreed she never saw the Defendant with a gun, and she never saw him touch anyone. She said that the Defendant repeatedly told the tellers to "hurry up" while they were putting the money in the bag.

Gladys Gutierrez, the other teller present during the robbery, testified she was waiting on a regular customer, Georgie Stenson, when she noticed the two robbers sitting on the couch. Gutierrez said her duties included assisting customers opening a new account at the bank, and one of the other tellers told her that the men wanted to open an account. Gutierrez said that, based upon the men's disguises, she pulled the alarm, which informed police that the bank was being robbed. Shortly thereafter, the man in the grey hoodie brandished a gun and informed her that the men were robbing the bank. Gutierrez identified and described the photographs taken during the robbery by the security system. She said that, in one, the Defendant is seen with his hand raised, and she recalled that he was telling the tellers to open the teller door to allow them in the back area of the bank.

Guiterrez said, during the robbery, she asked the robbers if customer Georgie Stenson could sit down. She explained that Stenson had nothing to do with the robbery and asked if she could move out of the way. The Defendant responded to her request, and told her that it was okay for Stenson to sit. Guiterrez then went back and assisted the other tellers in getting the money together and, while she was doing so, both robbers were telling the tellers to "hurry up." Guiterrez then described how the robbers asked for a set of car keys and how Anderson offered hers and was instructed to leave with the robbers. Guiterrez described the Defendant as "calm" during the robbery, never appearing surprised or shocked at anytime. Guiterrez said she "felt like he actually knew exactly what [they] were doing. [The Defendant] was the one that demanded for us to open the [teller] door in the beginning."

On cross-examination, Gutierrez said that Vasquez first told Anderson that he was robbing the bank. She said that, when she asked if Stenson could sit down, the Defendant motioned, indicating agreement, but did not verbally respond. She said Vasquez was the robber who asked for keys to a car and also the one who demanded that Anderson leave with the men. She testified she was present when police officers later returned with the Defendant to have the tellers attempt to identify him. Guiterrez said she was able to identify the Defendant as the man who had participated in the robbery.

--

6

On redirect examination, Guiterrez said, based on the two robber's demeanor, she thought the Defendant was in charge of the robbery.

Tara Stanton testified that, on January 15, 2008, she was working at a hair salon when, around lunchtime, the employees discovered they were in need of smaller bills. Stanton went to F&M bank where the salon held an account. When she arrived, she pulled up to the drive-thru, and teller Dueker looked at her, shook her head "like no," and raised her eyebrows "really high." Stanton said she found this behavior unusual and different from Dueker's normal demeanor. Stanton said she looked inside the bank, where she saw two men, one wearing a grey hoodie and the other wearing a green plaid jacket. Both men wore sunglasses, and the man with the green plaid jacket also had on a John Deere hat. Stanton then noticed that the man in the grey hoodie held a gun and that the tellers were gathering money and putting it into a bag.

Stanton testified that the man in the grey hoodie went behind the teller wall while the man in the green cap stayed in the lobby, occasionally speaking with the tellers. Stanton then saw Anderson attempt to remove a key from her key ring. She was shaking so badly that another teller had to help her. The robber in the grey hoodie "had [Anderson's] arm," and Anderson left with the robbers. Stanton said she did not have her cell phone with her and could not call 911. She did not leave and get help, however, because her "only thought was to protect [Anderson] [w]hen [she] saw that they were taking her hostage and leaving the building."

Stanton testified that Anderson and the men came around the bank to an area close to the drive-thru lane, and Stanton noticed that Anderson appeared "[s]cared." She then heard a loud "bang," and saw smoke coming from the money bags, which she assumed meant the dye packs had exploded. The man in the green hat "took . . . off towards the front of the building." Anderson and the other man kept walking toward Anderson's vehicle. Stanton said she started backing her car up, with the intention of blocking the robber's exit from the bank parking lot. She said she backed her car directly behind Anderson's vehicle, and she saw Anderson run away from the vehicle. The robber in the grey hoodie, who was driving Anderson's vehicle, then backed Anderson's vehicle into Stanton's truck, which she described as a "Chevy, three quarter ton, four wheel drive." Stanton said that the robber then tried to back up again, and Stanton accelerated her truck and pushed the vehicle the robber was driving.

At this point, the robber exited Anderson's vehicle and came to Stanton's window. He tried to open her door and then pointed the gun at her and told her to get out. She told him "no," and he again pointed the gun at her and told her to get out. She again refused, and the robber "took off running" into a park behind the bank. Stanton said she put her

--

7

truck in drive, followed the robber, and "bumped" him with her truck. The robber became "quite angry" and tried to get into Stanton's vehicle again. She again refused, and the robber shot the lock out of the truck. The robber then looked around, saw a blue minivan close by, and ran toward the minivan. When he got to the minivan, he opened the door, started arguing with the driver, and then got inside the minivan. The minivan then drove out of the park. Stanton testified that, at this point, police had arrived and chased the minivan.

Stanton testified that the Defendant appeared "very calm" during the entire time she observed him, until the dye packs exploded. She said that he did not appear to be a bystander and that he appeared to be involved in the robbery.

On cross-examination, Stanton testified she participated in identifying the Defendant when police brought him back to the bank. She said police officers had the Defendant stand outside the double glass doors of the bank, and she observed him through the doors and identified him. Stanton testified she never spoke with the Defendant, and she never saw the Defendant make any motions or physical contact with Anderson.

Sergeant Joe Difiore, with the Clarksville Police Department, testified that he was on duty on January 15, 2008, and he was the first officer on the scene of this robbery. When he arrived, he saw a vehicle parked in a parking space with a white truck "up against the back bumper" of the vehicle, as if "blocking it in." Sergeant Difiore made eye contact with the woman driving the white truck , and he noted the woman appeared calm. Then, out of the corner of his eye, he saw a man, who he later identified as the Defendant, running through the field. The officer noted that it was a cold day in January, and the Defendant was taking his coat off as he was running. The officer assumed the Defendant was involved in the robbery, and so he followed him. Sergeant Difiore testified that he stayed in his vehicle and was able to follow the Defendant for some distance, before the Defendant ran in front of his vehicle. At this point the Defendant had slowed down, presumably because he had become tired, and the officer pursued the Defendant on foot. The officer instructed the Defendant to halt, and the Defendant complied.

Sergeant Difiore testified that he spoke with the Defendant and asked him why he removed his jacket. The Defendant spoke to him, but the officer was unable to understand the Defendant's response. The Defendant shrugged his shoulders and indicated that he did not understand what the officer was saying. The officer explained to him that there had been a bank robbery and then walked the Defendant to the officer's car. The officer returned to the bank, with the Defendant in his car. Shortly thereafter, a detective asked the sergeant to walk the Defendant to the front of the bank doors so that bank employees could identify him. After turning over custody of the Defendant to other

--

8

officers, Sergeant Difiore searched the field where he saw the Defendant running. In the field, he found sunglasses, a quilted jacket, and a green John Deere hat.

On cross-examination, Sergeant Difiore testified that when he stopped the Defendant he took him into custody but did not immediately arrest him. The sergeant agreed that, initially, he thought the Defendant did not speak English. He said that, later, however the Defendant responded to him in English. The sergeant explained that, after he walked the Defendant to the bank for the identification, the two returned to the sergeant's car, and the Defendant was placed in the rear seat of the car. The windows were up and the doors were shut, and Sergeant Difiore was outside the car. At one point, the sergeant noticed that the Defendant was sweating, so he cracked open the rear door and asked the Defendant if he was hot. In English, the Defendant responded yes, so the officer left the door open.

Sergeant Difiore testified that, during the show-up identification at the bank, the Defendant kept looking away from the window. The sergeant repeatedly told him, and made gestures indicating, that he wanted him to face the door and look toward the door. The Defendant finally complied with the sergeant's request.

Maureen Blair testified that, on January 15, 2008, she was working at a nearby company when she took her lunch break at around 11:45 a.m. She picked up food and then went to a park to eat. As she was finishing, a man wearing a grey hoodie was running toward her car. She became uneasy, so she locked her car doors. The man approached her and held a gun to her driver's side window and told her to get out of the car. As she started to exit her vehicle, she heard police sirens approaching, and the man told her to get back into her car. He climbed over her and got into the seat behind her, telling her to drive. He told her to drive over the grass in order to avoid the white pick-up truck that was blocking the entrance of the park.

Blair testified that the man directed her to turn right, and she told him it was a dead end. He, however, told her to keep going that direction. Two police cars approached behind them and blocked the road. When she reached the dead end, the man told her to turn around and go over the grass to get around the police cars. Blair testified that, when she passed the officers, they had their guns drawn and pointed at her car. She waved at the officers to indicate that she was not involved in the crime.

Blair said that she successfully maneuvered around the officers, and went out to the main road, traveling north. The man instructed her to turn into a Wal-Mart parking lot, and she complied. At that time, a police car pulled up behind her and hit her car. Another police car pulled in front of her and blocked her, and the police officers exited

--

9

their vehicles and drew their weapons. Blair said police officers then began firing into her car through the front windshield. An officer approached Blair's window and told her to open the door. She did and, as she was exiting, she saw that the police had shot and killed the man who was in her car. Officers found a cap, a pair of sunglasses, a knife, a wallet, and a gun in her car, all items that had not been there before the man got into her car.

On cross-examination, Blair agreed the Defendant never entered her car. She also testified that the man who entered her car never made any statements related to the robbery to her.

Brad Crowe, a Clarksville Police Department officer, testified he responded to the call about a bank robbery on January 15, 2008, to assist in processing the scene. He gathered the following at the scene: a ball cap, sunglasses, a jacket, and a canvas bag containing money. The bag contained $11, 993 in cash and three $20 dye packs. Officer Crowe also collected the copper jacketing from the bullets fired in this case.

Clarksville Police Officer Francis Profitt testified that he responded to a call about a police shooting, where he assisted in processing the crime scene. He identified the evidence he retrieved, including a grey hoodie sweatshirt, Vasquez's wallet, sunglasses, ball cap, knife and gun. On cross-examination, Officer Profitt agreed he did not retrieve any evidence that implicated the Defendant.

Kristina Figueroa testified that the Defendant, whom she knew as Alejandro Lerma, was the father of her daughter. On January 14, 2008, the Defendant was at her home with two of his friends, Vasquez and a man named Alejandro Briones. The men had been drinking and were laughing and making jokes while discussing a bank robbery. Figueroa testified that she heard Briones and Vasquez discussing the robbery, and she asked the Defendant about the discussion later. She said that she did not recall the details of the conversation. Figueroa agreed she did not want to be in court and she did not want to testify against the Defendant. She recalled giving police a statement on January 23, 2008, but she said she did not remember what she said.

The State then asked her to read her statement, and, after doing so, Figueroa conceded that she had told police that Vasquez and Briones had come over to her house on January 14, 2008, and asked the Defendant if he wanted to participate in a bank robbery. Figueroa told police that the Defendant told the men "no," explaining that he wanted to be with Figueroa. She also told police that, when the men left, she asked the Defendant if the men's offer was real, and the Defendant said that they were only joking.

On cross-examination, Figueroa testified that the Defendant lived in Hopkinsville,

--

10

Kentucky, and had come to see her a few days before January 14, 2008. She said she heard only Vasquez and Birones discussing the bank robbery, and she maintained she did not hear the Defendant discuss this issue.

Sean Averitt, employed with the Clarksville Police Department, testified he was the lead detective in this case. He said that he was present during the Defendant's interview. Also present were Officer Nelson Rodriguez, who acted as an interpreter, and Special Agent Dan Hemmersmery, a Federal Bureau of Investigations ("FBI") officer. Sergeant Averitt testified the Defendant understood "a very limited amount of English," so the interview, which was recorded in its entirety, was conducted through Officer Rodriguez. On cross-examination, Sergeant Averitt testified that he was unsure of Officer Rodriguez's qualifications as an interpreter. He said that he called for Officer Rodriguez to come to the scene of the robbery, and the officer remained with him, interpreting for him, during the interview.

Amy Bermudez, a certified court interpreter, testified that she interpreted the recorded interview and provided a transcription of the interview to the court.

The State recalled Sergeant Averitt, who testified about his interview with the Defendant. He read portions of the interview into evidence. During the beginning of the interview, Sergeant Averitt attempted to ascertain the identity of the Defendant's accomplice. When he asked the Defendant if he knew the man, the Defendant said, "yes, because he asked me to work with him in Hopkinsville." When the officer asked the accomplice's name, the Defendant said "Roberto" but said he was unsure of Roberto's last name.

Sergeant Averitt recounted that, during the interview, he asked the Defendant how the robbery started. The Defendant responded, saying that Vasquez[1] came to his home during the night and talked to the Defendant about "going somewhere" to get "some cash," and the Defendant said he told Vasquez that he wanted to "go back to Mexico." The Defendant told the officer that Vasquez never told him where they were going and that the Defendant was desperate for money, which he needed in order to return to Mexico to be with his family. The Defendant said he told Vasquez "let's go." The Defendant conceded to the officer that Vasquez told him of the plan before they began the robbery. The Defendant said that a third man named "Hondo," who knew nothing about

---

[1] In the record and during the interview, the Defendant does not refer to the man who was present in the bank robbery by his last name, Vasquez. He refers to him largely as "Roberto," but police later learned the identity of the man as Roberto Vasquez. For clarity of the facts, however, we will continue to refer to Vasquez by his last name.

--

the robbery, drove the Defendant and Vasquez to the bank.

During the interview, the Defendant said Vasquez told the Defendant before the robbery to "leave [the robbery] to [him]" and took the Defendant and "Hondo"[2] to several banks. He said, "Everything was at the last minute. Suddenly, he told us okay, let's get out of here." The Defendant said Vasquez told the Defendant to enter the bank with him so the employees there saw that there were two robbers. He asked the Defendant to put on a fake moustache, but the Defendant said he responded that he was going to Mexico, so the moustache was unnecessary. The Defendant told the officer that he did, however, wear sunglasses and a green cap given to him by Vasquez and that he also wore a yellow sweatshirt.

When asked about his role in the robbery, the Defendant said the plan was for him to drive the "getaway" car. He explained that Vasquez told him that they were going to take "somebody's vehicle or truck" during the robbery and that they would leave the bank in that car. The Defendant said, however, he got scared when they exited the bank because a lady at the drive-thru kept looking at him, so he "took off running" as soon as they exited the bank. He said he was further upset by Vasquez's orders to one of the bank employees, asking her to leave with them. He told the officer that he did not have a gun during the robbery. He said that Vasquez always had the gun, and that he left the robbery with "nothing."

The Defendant said that, at first, Vasquez told him that Vasquez was going to "go cash a check," and that, when he did so, he would give the Defendant a cut of the check. The Defendant said that, as the men were driving around looking at banks, Vasquez and Briones were "laughing" when saying "cash a check," and the Defendant "figured" that meant that they were robbing a bank. The Defendant told the officer that, if the plan was successful, Vasquez was going to give the Defendant and Briones two or three thousand dollars each. The Defendant planned to use his money to immediately return to Mexico.

The Defendant said he expressed his concern to Vasquez that there would be police. The Defendant told the officer that Vasquez responded by saying that there were no police and that the bank employees would not call police because they had insurance that would cover the money stolen. The Defendant confirmed that, before the robbery, Vasquez "had already told him" what was going to happen. The Defendant told the officer that they began driving around at 11:00 a.m. that morning. He said that, when Vasquez picked him up, Vasquez asked whether he was excited, and the Defendant

---

[2]Police later identified "Hondo" as Alejandro Briones (spelled phonetically by the court reporter). Briones was also charged for his participation in this robbery.

--

12

responded "no man." The Defendant then got into the car, and Vasquez told him the plan. The Defendant said that, while he was running away from the bank, he took off his glasses and jacket. The cap, he said, fell off on its own.

Sergeant Averitt testified that, during the interview, the Defendant would sometimes answer a question that the sergeant posed before the interpreter posed the question to the Defendant in Spanish. He said that the Defendant answered in Spanish. Sergeant Averitt said that police also learned that the car Briones drove to the robbery was registered to Vasquez.

On cross-examination, Sergeant Averitt testified that during his interview with the Defendant he surmised that the Defendant knew of the robbery plan before he entered the bank. He based this on the fact that the Defendant and Vasquez discussed that there were no police or security present at the bank, that they went into the bank wearing a disguise, and from the Defendant's statement that Vasquez told him before they entered that they were going to take money from the bank. The officer testified that the interview lasted one hour and forty-five minutes. He said that, based on the Defendant's behavior during the interview, the officer believed the Defendant was not fluent in English but that he understood some English, in part because the Defendant sometimes answered questions before the interpreter interpreted the questions for him.

Sergeant Averitt discussed the Defendant's claim that he thought he was going with Vasquez to cash a check. The sergeant agreed that hospital personnel who attended to Vasquez before he died found a check stub in Vasquez's possession, and they gave that stub to the police. The sergeant also agreed that, during the Defendant's interview, the Defendant repeatedly said that Vasquez said on multiple occasions that they were going to the bank to cash a check. He explained, however, that he did not find credible the Defendant's claim that he was only accompanying Vasquez to cash a check in light of the Defendant's other statements.

The State rested, and the Defendant testified on his own behalf. He stated that, at the time of the robbery, he lived in Hopkinsville, Kentucky. Before that, he had lived in Clarksville, Tennessee, where he was employed as a construction worker. The Defendant said he had been in the United States for a year and a half before his arrest. The Defendant testified that Vasquez, whom he knew through working construction, drove him from Hopkinsville to Clarksville on January 13, 2008, because the Defendant wanted to visit his brother. When they arrived in Clarksville on the 13th, Figueroa, the mother of his child, saw the men drive by, so she contacted the Defendant. The Defendant said that he stayed only a couple of hours at his brother's house and then went across the street, where some of his friends lived. He spent his first night in Clarksville in a hotel with

--

13

Figueroa. He said he spent the following night, the night of the 14th, at his friends' house located across the street from his brother's house.

The Defendant denied ever being in the presence of Vasquez or Briones while Figueroa was present. He said that she testified incorrectly when she heard Vasquez state that they should participate in a robbery. The Defendant explained that he was with Vasquez at the bank the day of the robbery because Vasquez owed him nearly two thousand dollars for drywall work that the Defendant had completed. Vasquez told the Defendant that he was going to cash a check, and the Defendant accompanied him to the bank. The Defendant said that, as they entered the bank, Vasquez told the Defendant to have a seat at a desk, and the Defendant complied. The Defendant said he then saw Vasquez don the false moustache, so he asked him "what are you going to do?" Vasquez responded that he was just going to talk to the manager. The Defendant testified he then saw Vasquez draw a "pistol" while talking to the bank employees. He said he asked Vasquez "[W]hat are you doing?," but Vasquez would not answer him and just stood there. The Defendant said he told Vasquez to stop, saying "stop it, let's get out of here" several times. The Defendant said that, because Vasquez did not listen to him and did not stop, he "just walked out" of the bank. He said, after he walked out of the bank, he ran away, taking off his jacket, sunglasses, and cap.

The Defendant testified that he did not know before he entered the bank that Vasquez planned to commit a robbery. He said that he drove to the bank with Briones and Vasquez and that Vasquez never discussed robbing a bank. The Defendant said that the bank tellers' testimony that he was telling them to "hurry up" and that he cooperated with Vasquez was untrue. He said, rather, he was trying to get Vasquez to stop what he was doing. The Defendant also denied telling customer Georgie Stenson that she could sit down, saying that the only person he talked to was Vasquez. The Defendant said that Vasquez never told him that he was in possession of a gun or a knife, reiterating that the first time he saw the gun was when he was seated at the desk in the bank.

The Defendant said that he never asked anyone for their car keys while he was at the bank. He said that he did not see Stanton when he left the bank. The Defendant said he could not communicate with the police officer who arrested him because he did not understand much English.

On cross-examination, the Defendant testified that the transcript of his police interview did not accurately reflect what he said to officers during the interview. The Defendant conceded that he answered "yes" when the officer asked him whether he knew of Vasquez's plans to rob the bank before it happened. He explained that he did not know what the officer was talking about. He denied ever telling police that he knew about the

--

14

robbery before he entered the bank. He denied telling police that Vasquez said there would be no trouble because there would not be any police. He denied telling police that Vasquez asked him to enter the bank with him so that the bank employees would see that there were two robbers. The Defendant maintained that the only thing he told officers was that he was accompanying Vasquez to the bank because Vasquez owed him money.

The State presented the Defendant with photographs taken by the bank's security system. The Defendant said that he was "pointing" in the picture because he was asking Vasquez what he was doing. The Defendant acknowledged that one picture depicted him facing away from Vasquez and pointing to the door. He said that "that's when [he was] walking back and forth." He said that the bank tellers were being untruthful when they testified that he was, at this point, telling them to open the door. The Defendant maintained that the only person he spoke to was Vasquez and that he only asked him what he was doing. The Defendant said he never heard Vasquez ask Anderson for her keys and that he never heard Vasquez ask Anderson to leave with him. He said he left before Vasquez and never saw Vasquez depart the bank.

In rebuttal, the State offered Judith Khristy, an expert in translation, who testified that she was a certified Spanish interpreter. She said that she had reviewed the transcript of the Defendant's interview and that it was substantially accurate.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to support his convictions; and (2) the trial court erred when it made several evidentiary rulings.

### A. Sufficiency of Evidence

The Defendant contends the evidence is insufficient to sustain his convictions. He asserts that he was merely present during the commission of this crime and that his presence is not a sufficient basis upon which to convict him. He asserts that he was only present at the bank to get money Vasquez owed him after Vasquez cashed a check, that he tried to get Vasquez to stop robbing the bank, and that he left the bank before Vasquez completed the robbery. The State counters that the evidence is sufficient to sustain each of the Defendant's convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R.

--

15

App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see also Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Conspiracy to Commit Aggravated Robbery

The Defendant was convicted of conspiracy to commit aggravated robbery. Conspiracy is proven when a defendant and at least one other person "each having the culpable mental state required for the offense which is the object of the conspiracy and

--

16

each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense." T.C.A. § 39-12-103(a) (2010). The agreement necessary to establish a conspiracy does not need to "be formal or expressed, and it may be proven by circumstantial evidence." *State v. Vasques*, 221 S.W.3d 514, 522 (Tenn. 2007) (quoting *State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998)). Aggravated robbery is robbery: "(1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it would be a deadly weapon . . . ." T.C.A. § 39-13-402 (2010). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401 (2010).

In the case under submission, the proof presented, in the light most favorable to the State, proves that the Defendant and Vasquez discussed robbing a bank on the night before the bank robbery. Vasquez picked up the Defendant in the morning, and a third man drove them to multiple banks. The men decided upon the F&M Bank to rob because of the lack of security or police officers present. Vasquez told the Defendant to enter the bank with him so the bank employees would see two robbers. Vasquez and the Defendant also agreed that the Defendant would drive a "getaway" car from the bank. Before they entered the bank, Vasquez asked the Defendant to put on a fake moustache, but the Defendant said it was unnecessary because he was going to return to Mexico after the robbery. The Defendant entered the bank wearing sunglasses and a green cap, which he said Vasquez gave to him. The Defendant and Vasquez entered the bank and asked to speak with someone regarding opening an account. Vasquez then brandished a weapon, and the men ordered the tellers to allow Vasquez through the gate and to put money in the bag. Several of the witnesses testified that the Defendant did not appear surprised or alarmed when Vasquez brandished the weapon and that the Defendant told them to "hurry up" during the robbery. Some of the witnesses testified that the Defendant's demeanor indicated that he was the one in charge.

The Defendant testified at trial, and he maintains on appeal, that he was unaware that Vasquez was going to rob the bank and that he simply thought he was accompanying Vasquez to cash a check. The jury rejected this contention, and the evidence supports the jury's verdict. The Defendant is not entitled to relief on this issue.

**2. Aggravated Robbery**

The Defendant was convicted of four counts of aggravated robbery, one count for each of the four tellers present during the robbery. Aggravated robbery is robbery: "(1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it would be a deadly weapon . . . ." T.C.A. § 39-13-402

--

17

(2010). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401 (2010).

Under a theory of criminal responsibility, "[p]resence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have played a physical role in the crime in order to be held criminally responsible for the crime. *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Rather, to be held criminally responsible for the acts of another, the defendant need only "associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *see also State v. Steven Nelorn Hampton, Jr.*, No. M2004-00704-CCA-R3-CD, 2005 WL 677279, at *5 (Tenn. Crim. App., at Nashville, Mar. 24, 2005) (finding sufficient evidence to convict the defendant of especially aggravated robbery under a criminal responsibility theory because he admitted that he shared in the proceeds of the robbery, was present at the scene of the crime, and was with his co-defendants both before and after the commission of the crime).

The evidence at trial proved that each of the four tellers were forced to place the cash from their drawers into a cloth bag while Vasquez held a gun and the Defendant told the tellers to "hurry up." The Defendant watched the tellers place the money into the bag and directed their movements. The jury made it clear by its verdict that it did not find credible the Defendant's claim that he was unaware that a robbery was going to take place, that he repeatedly told Vasquez to discontinue the robbery, and that he left the bank when Vasquez failed to honor his request. Credibility determinations are left to the jury. *See Bland*, 958 S.W.2d at 659. The evidence at trial is sufficient to sustain the Defendant's four convictions for aggravated robbery. The Defendant is not entitled to relief.

### 3. Especially Aggravated Kidnapping

The Defendant was convicted of especially aggravated kidnapping with regard to the robbers leaving the bank with Anderson. Especially aggravated kidnapping, a Class A felony, is false imprisonment "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-305 (2010). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302 (2010). As previously stated, under a theory of criminal responsibility, "[p]resence and companionship with the

--

18

perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." *Ball*, 973 S.W.2d at 293. No particular act need be shown, and the defendant need not have played a physical role in the crime in order to be held criminally responsible for the crime. *Caldwell*, 80 S.W.3d at 38. Rather, to be held criminally responsible for the acts of another, the defendant need only "associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." *Maxey*, 898 S.W.2d at 757; *Hampton*, 2005 WL 677279, at *5.

The evidence viewed in the light most favorable to the State proved that, after tellers had placed the money from their drawers into a cloth bag, Vasquez demanded that one of the tellers provide the men with their car keys. After Anderson volunteered her car keys, Vasquez, who was still in possession of the gun, ordered Anderson to leave the bank with the men. Surveillance video from the bank's security cameras showed that the three left the bank together and went toward the back of the bank where Anderson's truck was parked. Witnesses also testified that the three left together. The dye pack that tellers had placed in the cloth bag with the money exploded. At that point, the Defendant ran away from Vasquez and Anderson and through a field, before he was apprehended by police. In his statement to police, the Defendant said that his role in the robbery was to include driving the "getaway" car. This evidence is sufficient to sustain the Defendant's conviction for especially aggravated kidnapping. The Defendant is not entitled to relief.

### B. Evidentiary Rulings

The Defendant next contends that the trial court erred when it made several evidentiary rulings. He first asserts that the trial court erred when it allowed the admission of the Defendant's confession because police officers failed to properly administer *Miranda* warnings, he was denied a certified interpreter, and denied the assistance of counsel. He next asserts that the trial court erred when it allowed testimony about the "show-up" identification of him and also when it allowed photographs of him at the crime scene because the State did not lay a proper foundation and because the evidence was unduly suggestive. Finally, the Defendant contends that the trial court erred when it allowed an expert witness to testify without the State first establishing a sufficient foundation.

### 1. Confession

The Defendant contends that the trial court erred when it failed to suppress his confession. He contends that his convictions should be vacated because of the following actions by the State: giving him "ineffective Miranda warnings, [the State's] coercive

--

19

interrogation techniques resulting in a coerced confession and deprivation of the defendant to equal protection under the laws by depriving him of a certified interpreter, which has been recognized as constitutional requirement under Tennessee's law, deprived the defendant of fundamental trial rights protected by law."

The record evinces that the Defendant filed a motion to suppress his confession. The trial court held a hearing on that motion to suppress. The Defendant has failed to include in the record a transcript from the hearing on the motion to suppress. It is the appellant's duty to ensure that the record on appeal contains all of the evidence relevant to those issues which are the basis of the appeal. *State v. Brenda Faye Worley*, No. 03C01-9608-CR-00322, 1997 WL 531153 (Tenn. Crim. App., at Knoxville, Aug. 29, 1997) (citing Tenn. R. App. P. 24(b); *State v. Banes*, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993); *State v. Deborah Gladish*, No. 02C01-9404-CC-00070, 1995 WL 695125 (Tenn. Crim. App., at Jackson, Nov. 21, 1995), *perm. app. denied* (Tenn. May 6, 1996)). An appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998). Therefore, while our review of this issue is hampered by the Defendant's failure to include the transcript of the motion to suppress hearing on appeal, we may still consider this issue based upon what is included in the record. *See State v. Smotherman*, 201 S.W.3d 657, 660-61 (Tenn. 2006); *see also State v. Siliski*, 238 S.W.3d 338, 365 (Tenn. Crim. App. 2007).

The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). This standard mandates that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23; *see State v. Randolph*, 74 S.W.3d 330, 333 (Tenn. 2002). The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W .2d at 23. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* However, this Court reviews the trial court's application of the law to the facts de novo, without any deference to the determinations of the trial court. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The defendant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. *Odom*, 928 S.W.2d at 22-23; *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const.

--

20

amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, Section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The significant difference between these two provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An exception arises, however, when a government agent makes a custodial interrogation. Statements made during the course of a custodial police interrogation are inadmissible at trial unless the state establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). "Confessions that are involuntary, i.e., the product of coercion, whether it be physical or psychological, are not admissible." *State v. Phillips*, 30 S.W.3d 372, 376 (Tenn. Crim. App .2000) (citing *Rogers v. Richmond*, 365 U.S. 534, 540 (1961)). In order to make the determination of whether a confession was voluntary, the particular circumstances of each case must be examined. *Id*. at 377 (citing *Monts v. State*, 400 S.W.2d 722, 733 (1966)). "Coercive police activity is a necessary prerequisite in order to find a confession involuntary." *Id.* (citing *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)). "The crucial question is whether the behavior of the state's officials was 'such as to overbear [defendant]'s will to resist and bring about confessions not freely self-determined.'" *Id*. (quoting *Rogers*, 365 U.S. at 544); *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). The question must be answered with "complete disregard" of whether the defendant was truthful in the statement. *Phillips*, 30 S.W.3d at 377 (citing *Rogers*, 365 U.S. at 544).

The Defendant's first contention is that law enforcement officers gave him "ineffective" *Miranda* warnings and that he was coerced into giving his confession by being denied a certified interpreter. The trial court held that the *Miranda* warnings had been properly given. It further stated on the record:

> I do not know of any law that requires that [the Defendant] be provided an attorney just because he's not a citizen of the United States, in the sense of automatic he can waive it just like anyone else, and he did in fact waive it

--

21

based on what I've heard throughout the trial of this case, or other motions, whatever, the translation is correct in the transcript.

The transcript of the Defendant's confession evinces that a law enforcement officer read the Defendant his *Miranda* warnings, which were translated into Spanish for the Defendant. The Defendant then read the Spanish version of the waiver of his rights form, and he initialed that form.

In his brief, the Defendant states, "Tennessee law has long recognized the requirement for a certified interpreter in circumstances where a defendant had difficulty with language proficiency and translation from his native language to English." He then cites three cases, each of which we will examine herein. The first case the Defendant cites to support this proposition is *State v. Baldomero Galindo*, No. E2009-00549-CCA-R3-CD, 2010 WL 4684469 (Tenn. Crim. App., at Knoxville, Nov. 19, 2010), *perm. app. denied* (Tenn. Apr. 13, 2011). In that case, a defendant appealed the trial court's failure to suppress his statement. This Court held that the defendant had waived the issue by failing to timely file a motion for new trial. We further held that the issue did not warrant plain error review. In so doing, we stated:

> The evidence presented at the pretrial hearing and the trial demonstrated that the Defendant gave two pretrial statements and that he was given proper Miranda warnings before both. He did not make any inculpatory statements in his first interview. In the second, he waived his rights, of which he was advised in both English and Spanish. He also signed a written waiver of rights, which was in English. A certified interpreter translated during the entire process. He acknowledged his understanding after both admonitions.

*Id.* at *16. We fail to see how this case stands for the proposition that there is a "requirement for a certified interpreter" to be present where a defendant does not speak English as a native language.

The next case cited by the Defendant, *State v. Spencer Peterson*, W2003-02939-CCA-R3-CD, 2004 WL 2791621 (Tenn. Crim. App., at Jackson, Dec. 6, 2004), *perm. app. denied* (Tenn. Mar. 21, 2005), the defendant therein appealed the trial court's failure to suppress his statement to police. The defendant contended that "his statement should have been suppressed because it was not knowingly and voluntarily made under the totality of the circumstances, in which he had just turned eighteen, was detained for four

--

22

hours without being charged, and was interviewed without the presence of his parent or a lawyer." There was no allegation that he was not provided a certified interpreter during his police interview, and this Court did not make a holding requiring as much.

The final case cited by the Defendant, *State v. Jason Lebron Rogers*, E2007-00354-CCA-R3-CD, 2008 WL 2278514 (Tenn. Crim. App., at Knoxville, June 4, 2008), *perm. app. denied* (Tenn. Oct. 27, 2008), which was also authored by the authoring judge herein, is equally unsupportive of the Defendant's assertion about the law. The defendant in *Rogers* contended that the trial court should have suppressed his confession, but he was, in fact, an English speaking defendant.

We conclude that the Defendant in this case was provided an interpreter, who properly translated his *Miranda* rights for him. A certified interpreter transcribed the video taped recording of the Defendant's confession, which included the law enforcement officer accurately relaying the Defendant's *Miranda* warnings. The Defendant read and signed the waiver of his rights, which was written in Spanish. During his confession, he never asked for an attorney or asked to remain silent. A second expert reviewed the video recording of the Defendant's statements and she testified that the transcription was "substantially accurate." We conclude that the Defendant was offered his *Miranda* warnings and that he knowingly and voluntarily waived his rights. The Defendant is not entitled to relief on this issue.

## 2. "Show-up" Identification

The Defendant next asserts that the trial court erred when it allowed testimony about the "show-up" identification of him and also when it allowed photographs of him at the crime scene because the State did not lay a proper foundation and because the evidence was unduly suggestive. The State counters that the Defendant has waived this issue by failing to include the suppression hearing transcript. Further, it contends, the issue is without merit.

The appellant has the obligation to ensure that the record on appeal is sufficient to allow meaningful review. *State v. Ballard*, 855 S.W.2d at 560-61. Thus, the failure to include the transcript of a suppression hearing generally constitutes a waiver of the issue. *See* Tenn. R. App. P. 24(b); *Thompson v. State*, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). When no transcript is included in the record, this Court must presume that the ruling of the trial court is correct. *See Ballard*, 855 S.W.2d at 560-61; *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983). While our review of this issue is more difficult without the transcript of the hearing, we conclude we can review this issue on its merits, basing our review on the evidence presented at trial.

--

During the Defendant's trial, each of the four bank tellers testified that, after the robbery, a police officer brought the Defendant back to the bank and had him stand outside of the glass doors of the bank. Each of these four tellers said she positively identified the Defendant as one of the robbers. The State also offered photographs taken by the bank's security system during the robbery, which depicted the Defendant's actions in the bank.

The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). This standard mandates that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23; *see State v. Randolph*, 74 S.W.3d 330, 333 (Tenn. 2002). The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id*. However, this Court reviews the trial court's application of the law to the facts *de novo*, without any deference to the determinations of the trial court. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The defendant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. *Odom*, 928 S.W.2d at 22-23; *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

### a. Show-up Identification

Convictions based on eyewitness identification at trial following a pre-trial identification will be set aside if the identification was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). "It has long been recognized that show-ups are inherently suggestive and unfair to the accused." *State v. Thomas*, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). A show-up occurs when police officers bring a lone suspect to a witness and ask the witness to identify the suspect. *See id.* at 381 n.1. The use of a show-up, however, may be warranted if (1) imperative circumstances necessitating the show-up exist, or (2) the show-up occurs as part of an on-the-scene investigatory procedure shortly after the commission of the crime. *Id.* at 381.

"To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998) (citing *Simmons*, 390 U.S. at 384). In *Neil v. Biggers*, 409 U.S. 188 (1972), the Supreme Court identified five factors for assessing the reliability, and therefore the admissibility, of an

--

identification. They are as follows: (1) the opportunity of the witness to view the perpetrator at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the identification. *Id*. at 199. These factors for evaluating the reliability of an identification have been adopted in this state. *See Rippy v. State*, 550 S.W.2d 636, 640 (Tenn. 1977); *Bennett v. State*, 530 S.W.2d 511, 515 (Tenn. 1975).

As previously stated, a show-up identification is admissible if it occurs as part of an on-the-scene investigatory procedure shortly after the commission of the crime. *Thomas*, 780 S.W.2d at 381. In this case, Officer Difiore testified that he responded to a call about a bank robbery at the F&M Bank. Upon his arrival at the scene, he saw the Defendant running away from the bank, through a field, while removing his coat. Believing him to be involved in the robbery, Officer Difiore pursued the Defendant, ultimately catching him a short time later. He then immediately returned to the bank with the Defendant, where the bank tellers identified him. Photographs taken of the Defendant by the bank's security cameras confirmed the Defendant's identity. Considering the factors enumerated in *Biggers*, we conclude that the trial court did not err when it denied the Defendant's motion to suppress testimony about the witnesses' identification of him and when it admitted this testimony at trial. The Defendant is not entitled to relief on this issue.

### b. Photographs Taken During Robbery

The Defendant also asserts that the trial court erred when it admitted photographs taken of him by the bank's security cameras during the robbery. He says on appeal that they were "cumulative and unnecessary" and that any probative value of the photographs was outweighed by their prejudicial effect. He also complains that an aerial photograph of the crime scene should not have been admitted because it was taken two years after the commission of the robbery and because it violated hearsay rules.

The admission of photographs is generally discretionary with the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. *State v. Jordan*, 325 S.W.1, 84 (Tenn. 2010) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978)). However, a photograph must be relevant to an issue that the jury must decide before it may be admitted into evidence. *Id.* (citing *State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998); *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); and Tenn. R. Evid. 401, 402). Evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. *Id.* Additionally, the probative value of the photograph must outweigh any

--

unfair prejudicial effect that it may have upon the trier of fact. *Id.*; *see also* Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]").

In this case, the trial court properly admitted each of the photographs. The first series of photographs, about which the Defendant complains, were photographs of him taken by the bank security camera during the robbery. The Defendant argues that the photographs were cumulative. We conclude, however, they were relevant to contradict the Defendant's contention that he was simply at the bank to accompany Vasquez cashing a check and that he was not aware that Vasquez was going to rob the bank. At trial, he claimed that he never had his back to Vasquez, that he pled with Vasquez to stop, and that he left the bank when Vasquez did not acquiesce to his pleas. The photographs depicted the Defendant's calm demeanor during the robbery and also showed his back turned toward Vasquez while he was pointing toward one of the tellers. It further showed him leaving the bank with Vasquez and Anderson. The other photographs, in which the Defendant was not depicted, aided the witnesses in telling and explaining the story of the bank robbery. After our review of these photographs, we conclude that they were not cumulative, and that each had independent evidentiary value.

We further conclude the trial court did not err when it admitted two aerial photographs of the crime scene. We first note that the Defendant failed to preserve his appeal of this issue by failing to include it in his motion for new trial. *See* Tenn. R. App. P. 3(e). Further, these photographs, while taken two years after the crime, aided the officer's testimony regarding where the Defendant ran, where the officer chased him, and where he eventually apprehended the Defendant. The photographs were not prejudicial, do not contain hearsay as the Defendant contends, and the trial court properly admitted the photographs. The Defendant is not entitled to relief on this issue.

### 3. Expert Witness

Finally, the Defendant contends that the trial court erred when it allowed an expert witness to testify without the State first establishing a sufficient foundation. He asserts that the expert who testified about the translation of the transcript of the Defendant's confession from Spanish to English did not "possess the ability to determine whether the process or system of recording the CD with the interrogation . . . had any deleted or altered files"; that the expert could not verify that "testing studies as a valuable aid to assist the jury in determining if her method of training allowed her to answer questions on testing methodologies of the recording by the state, defendant was not armed at any time"; and also that "there was no testimony . . . to verify that the expert's failure to graduate from college was counterbalanced by her experience in method or process

--

26

analysis to qualify her to answer defense counsel questions in the area of file alteration or deletion."

At the Defendant's trial, Amy Bermudez, a certified court interpreter, testified that she interpreted the recorded interview and provided a transcription of the interview to the trial court. Portions of the transcript were then entered into evidence through Sergeant Averitt's testimony. The Defendant testified on his own behalf and, several times, said that the transcript did not accurately reflect what he had told Sergeant Averitt during the interview. In rebuttal, the State offered Judith Khristy, as an expert in translation. She testified that she was a certified Spanish interpreter and that she had reviewed the transcript of the Defendant's interview and found that it was substantially accurate. The Defendant objected to Khristy's qualification as an expert, arguing that she could not testify accurately about whether there were portions of the DVD missing. He maintains this argument on appeal.

Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court. *See State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002) (citing *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257, 263-64 (Tenn. 1997); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)). On appellate review, the trial court's ruling shall not be overturned absent a finding that the trial court abused its discretion in admitting or excluding the expert testimony. *Id.* (citing *Ballard*, 855 S.W.2d at 562). "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id.* (citing *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn.1997)).

In the case under submission, the Defendant's objection to expert witness Khirsty's testimony is one that he could have addressed on cross-examination. Her inability to testify about the method used to record the interrogation or whether there were portions of the interrogation omitted from the transcript of the DVD are not relevant to the determination of whether she was qualified to testify as an expert that the transcript of the interrogation provided by Bermudez accurately reflected what was said during the interrogation. This issue is without merit.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

--

27

_____
ROBERT W. WEDEMEYER, JUDGE

--